Mr. Clerk, call the next case please. We're ready when you are. Good morning, Your Honors. My name is Chris Evers from the Office of the State Appellate Defender representing the Appellate, Mr. Thomas Gatch. Could you give us your last name again? I'm sorry, Evers. E, V as in Victor, E-R-S. Thank you. May it please the Court. As always, I would welcome direction from the Court if there's any particular issue or nuance of Mr. Gatch's appeal that you'd like me to focus on first. Otherwise, my plan is to initially rest on our briefs on our first issue, that the evidence was insufficient to sustain the conviction. And in the alternative, our third issue, that the trial court's error of not giving the proper or fore instructions to the jury during voir dire under Rule 431B mandates that he get a new trial. But I want to focus on the second issue we raised, that Mr. Gatch's Fourth Amendment rights were violated, which means that the motion to suppress the additional evidence and the acquired knowledge from the police should have been granted and not allowed at trial because the police came to his apartment to arrest him with no probable cause, and there were no circumstances that would have authorized a warrantless entering to his house. All right. If you're going to start with that issue, do you believe you properly preserved it? Yes. It was fully briefed, and a suppression hearing was held, and that was going on. It was not necessarily mentioned in the motion to new trial, but under ENOC it was a constitutional issue. It was discussed, and this is something that is appropriate for this Court to hear on appeal as you are sort of reviewing a full transcript of this and can make that determination. Then, again, staying with that issue, you've got, it's the middle of the night, there is clearly a fire that occurred in the stairwell. Absolutely. Everyone agrees to that. Set by an unknown person, and a neighbor identifies this defendant as being the likely person who started the fire, after watching the video. The two building manager individuals told the detective after watching the video that that's Mr. Gatch, which is true because he was on that video and the later video clipped. Of course. And why do you contend that that was not sufficient for the police to enter the apartment of that individual? Okay. Within a few minutes of when all this really occurred. Well, two points to that. So there's the probable cause issue, which in keeping with the detective's determination, about two hours after that fire was set. So this is not a matter of five or six minutes and then the police are there. But for the probable cause issue, some of the best evidence of that is that the idea is that a person of reasonable caution would have committed that offense. This was a process of elimination case. There's video, the unknown person goes in the direction of 3B and 3A. The detectives know that. But there's kind of a jump to judgment there. The building manager is saying that that's Mr. Gatch. The detective said, you can't see the individual's face. The clothing is different for that. So that is kind of the jumping the gun. And the state's own authorities that they quoted or studied in their briefs are talking about Bauer and James, talk about much more specifics. In both of those cases, a specific defendant fought or argued with the victim of the arson only 20, 30 minutes before the arson was set. The arson was set in a very specific area that that defendant was known of access to, in which case his own townhouse, but not away from him, but towards the two other residents, or an apartment of the victim that he had a key to but had gotten to the building without permission. So that was a narrowing that's more. But here we know that the person that they identified lived in the building. Yes. Lived on the third floor. Had access to the stairway. And was identified on the surveillance video by a caretaker in the building who was familiar with the defendant. So where do you go from there? I guess part of it is the identification aspect. We keep saying identification. The detective said that. But what the detective said is that they told him they saw Mr. Gatch and knew him. And there's no doubt Mr. Gatch is in that stairwell approximately 20 minutes after the file. That connection is not as specific as the cases cited by the state that I've been discussing here. But I understand that this is a narrowing here. And the idea is that apartment 3B and 3A, not knowing who all the residents of 3B might be, were arguing was insufficient for the probable cause finding. But even if this Court agrees that there was probable cause for the detective, the issue was whether the police had the ability and right to go through the door of Mr. Gatch's apartment in 3B with no warrant. And that's one of the most highly protected things under the Constitution. The first time. Whether they had the right the first time. Exactly. The second time. We don't want you to change anything about that, of course. But the first time. And there was clearly a warrant. And so what the prosecution argued at the trial there was that there was an insufficient circumstance. And this is a very specific limited exception which did not exist under the facts of this case. Are you talking about the community caretaker exception? I won't explain it to you, Your Honor, because we fully briefed that in our opening brief. The state did not seem to respond. And they were clearly going into arrest. That's police investigation. That's not what the community caretaker provision is about. Here, though, the circuit court in its findings seemed to focus exclusively on a single sentence about that he was upset or sadder than day before which the detective learned from the two building managers. Some indeterminate time talking about the loss of a lady friend and their words who had taken her own life. But that was some unknown time in the future. This was approximately two hours after the fire was set. And the court elevated that unknown emotional setting of the individual, Mr. Gatch, at best. They must go into the apartment right now because the detective testified basically he's going to start another fire to either harm himself or try to set this whole building on fire. And that is a leap too far based on the information that he has. And that goes to the factors that are listed first in the Illinois Supreme Court and Foskey that went through a variety of factors. Not all need to be there. But Mr. Gatch was not armed. There's no evidence of that. One of the things they look at the most is the grave nature of the crime, the violent nature of the crime. He wasn't armed, but he possibly had the capability to set another fire. That's more specific to this case. Well, that's true, Your Honor, but the video itself shows that the individual there kind of put a small plastic bag down that you could get in any drugstore and a fire started. This was not cans of gasoline being thrown around, not an incendiary device. Everyone in that apartment building had the same means to start a small fire assuming that they had a lighter, matches, or any other common household item. So there's no information, which Foskey discussed, about knowing a specific weapon, or a homicide, or a violent beating taking place, which are the nature of the cases discussed when they mean violent in nature. The police, the detective's own words also kind of cut against that. They went up there. He was scared or feared for the worst, even more when he docked at 4 o'clock in the morning and no one answered, which is not an uncommon experience. And he forgot to check for fire when he went inside. That's the detective's testimony.  Even though getting a warrant in the city of Chicago, this 24-hour felony route to get that process started, he wasn't worried enough to actually check for the fire, which is reason and rationale for going in. That doesn't rise to the level of actual circumstances from the cases discussed in Foskey, and it's not enough to overcome the powerful protection of the Fourth Amendment for someone's own home to going in without a warrant. Well, did he have to have a continuing concern when he went into the room or the apartment and found the defendant asleep on the couch? He had to have a concern to go through the door without permission from Mr. Gaps. It's really just crossing that threshold that we're talking about. That's what I would think the focus would be, but now you seem to say that he needed to have a continuing concern when he got in the apartment. Well, if the only concern that's been expressed in that the court found that a fire was going to be started, seeing Mr. Gaps sleeping there doesn't belay that concern. Him being there may be, you know, him sleeping, he may first see him, so it shows where he is. But if their concern was a fire had already been started, that is what they testified to. That is what the circuit court expressly said when finding those evident circumstances. And so choosing not to search for it, I'm just saying, is demonstrating that maybe it wasn't as pressing a concern as possible. And under Foskey, in another case discussed by that, none of those situations rise to the edge of uncertainty. There's such a leap there, and the idea of just being upset the day before also doesn't seem to suggest that, yes, this person is going to be setting another fire two hours after the first one. There is a lot of missing leaps of logic to get that as necessary to go in without a warrant, is what we're asking this Court to find today. Assuming that we don't find for you on your first two issues the third issue, the 431B violation, the remedy that's available is dependent upon whether this was a closely balanced case or not. Now, the question I have to you is, you suggest that this is a closely balanced case. Why? A variety of reasons, Your Honor. Assuming that the identification at the end of the day was not, I saw Mr. Thomas Gash in his face right there. We're already talking about, as Mr. Santiseris admitted, he doesn't know who the person in the dark clothing is. They have reached to that conclusion, and the jury themselves are telling us that. They asked about the clothes, the dark clothes that, they wanted to know what was going on with that. They asked about the testimony of Mr. Santiseris to get a transcript of that was sent back. And given that the admonition that was not provided, the defendant has no obligation to present any evidence at all, and they are now talking about evidence that they wish that they had that they don't have, that shows that it is potentially closely balanced in the jurors' mind. And that's really the issue for closely balanced. It's not... You're suggesting we can read jury notes to determine whether it's closely balanced? Well, I'm saying that it's certainly something that the jury is communicating. Does a jury note say, you know, we're split? That's not the evidence I'm asking for, but it's a demonstration that the evidence itself wasn't as clear cut. If they didn't need other questions or have a bunch of questions, they wouldn't ask for that. But closely balanced doesn't mean that there has to be two equal competing narratives. The error was not giving this precise instruction. The jury itself was talking about evidence that wasn't presented. And given that there is no straightforward identification, there is no forensic evidence that existed in some of the other reasonable doubt cases that were discussed by both parties earlier in our briefs... Is it your position, then, that on your third issue, and following up to Justice Hoffman's question, the evidence doesn't necessarily have to be closely balanced in the sense that there's evidence on one side and contradictory evidence on the other side as opposed to just being very weak? Yes, it's closely balanced. The jury is really agonizing, for lack of a better term, to kind of what the decisions are going to make for that. And the nature of criminal prosecutions and our Constitution allows that it doesn't have to present evidence. Closely balanced can't mean there has to be evidence from both sides. That's not what the Constitution allows for or protects against. So, yes, it's weak. It's not clear. This error mattered in how the jury reached their decision. And given that there's only 12 people who truly know how they're going back and forth, the reason I brought up the jury instruction is because it's the only little insight we have. But if it's so overwhelming, there's an indication they wouldn't need to ask about something. They could just make their decision. But, yes, Justice Hoffman, to answer your question, I do believe it is closely balanced. Let me ask you in the time remaining to just briefly address the first issue. Of course, Your Honor. I mean, this case is a little bit like a game of Clue. I mean, it's all circumstantial. Yes, Your Honor. And, you know, you do have some things recorded on video. Yes. The transcript is not as helpful as perhaps a reviewing court would like in terms of how it was presented at the trial, in terms of identifying different frames of the video, et cetera. Yes, Your Honor. But all that being, putting that aside, the jury sat and listened to all this. And we have a rather stringent standard in the light most favorable to prosecution. And why do you contend that when you view it in that light, the jury couldn't put all these pieces of the puzzle together and say it must have been him? Okay. You're right. So, in the light most favorable to the prosecution is all reasonable inferences. But it's not taking all the evidence the way the state wants you to take it. And that's really what we're focusing on here. We call it speculation. The unknown person in the dark clothes went off screen on clips one and three, basically somewhere between 3B and 3A. That is, multiple people there. There are two different apartments there. And so the idea that we don't have a clear identification, we have no forensic evidence, the only other person who testified who wasn't a police officer or a fire marshal has a motive and even contradicts themselves. I know it wasn't Philip, my partner. But I didn't wake up until this fire was already set, the firearm was already there. We're saying that that rises the level of speculation. And certainly the cases decided by the state and we even talk about the Brown there, is that there's a lot more for the circumstantial evidence. Because you can create a story, because you can create a narrative and want the jury to adopt it, doesn't necessarily mean that that's sufficient circumstantial evidence that this is something the court should allow it to stand. And that's the argument we're making here there. Can the state make a narrative? They did. Absolutely, I understand that. But given the authority that deals with circumstantial cases, there was no threat from Mr. Gatch. There was no clear identification. There was no forensic evidence. And there were two apartments accessible by that person in unknown, dark clothes that came off there. And given that, that doesn't rise the reasonable doubt standard that we want to put someone in jail or prison for a period of time. And if there's no additional questions from the audience, I will do my part. Thank you. Thank you, counsel. State. May I please the court, counsel? My name is Clara Wesley Connelly. I'm an assistant state's attorney and I represent the people of the state of Illinois in this case. I'd like to address the first issue that the defendant raised in his brief, which is the sufficiency of the evidence. The evidence in this case established the defendant's guilt for aggravated arson beyond a reasonable doubt. The videos in this case obviously narrow the focus and it's more a case in which we try to eliminate the possibilities of other people who have the access and living in that apartment building to have committed this offense. In the videos in this case, they clearly show that the arsonist came from the area of apartment 3A and 3B. 3B is occupied and released by the defendant himself solely. There's no evidence that anyone else ever came or left that apartment that day. The maintenance worker who testified at trial testified. He reviewed the videos. There's no one else coming from that area. We have the testimony from Craig Martin. Craig Martin is the occupant of apartment 3A. He shares that apartment with his partner, Phillip Robinson. Craig Martin testified that neither he nor Phillip Robinson left the apartment at any point. Your opponent would say that makes no sense because he testified he was asleep. So how would he know whether Phillip left the apartment or not? Correct. If he was asleep, but when he woke up, his partner was right there. And there's evidence that his partner is African American and defendant in this case and the video would submit that it was not someone who was African American. How do you... So the jury... I'm sorry. How do you assert that the video demonstrates the race of the suspect? The video is terrible quality and maybe for a millisecond you might see a shadow of a face. In terms of starting the fire, you don't see a face at all, right? Correct. Correct. So the only time you see even remotely you see a face in the video is between the two of them? It's consistent with someone who's Caucasian. And the jury got to be able to view that and from its verdict obviously found consistent with that. The jury was able to view the testimony of Craig Martin. We don't have a description of Craig Martin and what his make and size and everything like that was from the record. But the jury had it before that. So the jury could see if the defendant matched the size and the shape and the frame of the arsonist in this case from the videos. And that's exactly what the maintenance worker did in this case. Is there anything distinctive about what you see in the video in terms of an anomalous physique or anything like that? It could be any number of average people couldn't it? Correct. It could. But again his testimony doesn't discount the defendant. Again it's a process of elimination where we're narrowing the focus onto the defendant and the maintenance worker said yes he couldn't identify the defendant from that still shot from the video but the defendant was the same shape, size and height as the arsonist in this case. Again pointing towards the defendant. I'm not saying that's the linchpin of like oh we win you know but that's one of those it's all a matter of steps that are taken and all the reasonable inferences that can be made from the evidence in this case. So we have his testimony we also have the testimony from the maintenance worker he watched the video from camera 8 and he was able to determine that the person walked towards the defendant's apartment upon returning from setting the fire and approximately 20 minutes later we know the defendant was in his apartment 20 minutes later after setting the fire because he changes clothes and then he walks out of the hallway that time he's not so disguised then he walks down to the same exact stairwell where he just set the fire and the firemen are still there consciousness of guilt changing the clothes walking past him then he goes down to the lobby and he spends a significant amount of time with the two maintenance workers who are trying to remedy this situation and watches them as they're viewing the videos of this case all of this evidence 20 minutes after he sets the fire absolutely shows his consciousness of guilt he was there he was available and it could have been him from this and all of this evidence narrows the focus on to the defendant as the arsonist in this case because we know the arsonist didn't come from 3A because they saw his testimony and they could determine from his testimony whether or not he could have been the offender now a trial the defendant asserted a defense that it wasn't him it was somebody from 3A now on appeal he asserts for the defendant that he was the offender there is absolutely no evidence that there was anyone else in the apartment with the defendant there is no video evidence the video was looked at by the maintenance worker he said he did not see anybody else come and go from that area and the defendant lived in that apartment by himself so we submit the evidence established you only had 5 people testify you've got Mr. Barker the owner who wasn't there you've got Mr. Martin who was asleep with Philip you've got the arson investigator who was on the scene after it all happened and officer who also didn't get to the scene the only person left is Mr. Seneceros let's talk about him for a minute he's the maintenance worker he's the one who identifies says I looked at the video I recognize the defendant right well are you talking at trial or at the motion at the motion so if we're going to the motion there's testimony from the detective who spoke to him and from the detective testified that the two maintenance workers both told him that's the defendant the whole world of the defendant's knowledge at that point is based on Mr. Seneceros he was able to view the video but he didn't know the defendant correct okay and then he also spoke with the two maintenance workers who he relied upon their statements to him that that's the defendant that's the extent of what we know I'm sorry I misspoke the two     their statements to him that's the extent of what we know so how does he have sufficient knowledge to bust in the door because and if you're concerned about the fact that there's not an idea of the reason for the arson for the probable cause they found there was probable cause in that case in the absence of any eyewitness testimony saying that's the defendant so because it's a probable cause it's not proof beyond the reasonable doubt it gives the state's position then that probable cause existed because someone who didn't see the arson being set went to a detective and said I think oh there's probably that neighbor Mr. Gatch because he was upset about his girlfriend and that's sufficient or was there more I don't know when you say probably I don't know he doesn't cite the exact words of what the two maintenance workers told him the detective testified those two people identified the defendant from the video okay and they were concerned because remember they just saw the defendant coming down 20 minutes later okay so their suspicions were let's just say they were suspicious of the defendant at that point so it's a totality of the circumstances that the officer has and you know what we have to look to is an objective standard for fourth amendment purposes what a reasonable officer would do in that circumstance based upon what someone is telling them which was the exigent circumstances exception do you think the judge would have signed a search warrant on this absolutely yes again it's probable cause it's not proof beyond a reasonable doubt you know it's a lower standard that a police officer has to have in this case and as far as the exigent circumstances there's a multitude of factors that our viewing court will look at to determine whether or not there is an exigent circumstance that the judge would have signed a search warrant on this case and as would have  a search warrant on as far as the judge will look at to determine whether or not there is a search warrant on